


FILED
Mar 12, 2019
01:55 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Kelly Gautreaux | ) Docket No. 2018-06-0366 |
| | ) |
| v. | ) State File No. 11346-2017 |
| | ) |
| Hermitage Hall, et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Joshua D. Baker, Judge | ) |

---

### Affirmed and Remanded - Filed March 12, 2019

---

This interlocutory appeal involves a claim for medical and temporary disability benefits by a mental health aid employed in a residential group home for teens. The employee alleged suffering injuries as a result of physical altercations occurring in the group home. The employer did not dispute the occurrence of the incidents and acknowledged that the employee reported suffering headaches as a result. However, the employer denied that the employee's need for recommended psychiatric treatment arose primarily out of and in the course and scope of her employment. The trial court determined that the employee met her burden of establishing she would likely prevail at trial and ordered the employer to provide the treatment recommended by the authorized physician and to pay additional temporary disability benefits. The employer has appealed. We affirm the decision of the trial court and remand the case.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Presiding Judge Marshall L. Davidson, III, and Judge Timothy W. Conner joined.

Gregory H. Fuller and Chris R. Brooks, Knoxville, Tennessee, for the employer-appellant, Hermitage Hall

Zachary D. Wiley, Nashville, Tennessee, for the employee-appellee, Kelly Gautreaux

### Factual and Procedural Background

Kelly Gautreaux ("Employee"), a twenty-seven-year-old resident of Nashville, Tennessee, worked as a mental health aid for Hermitage Hall ("Employer") in its residential treatment facility for teenagers. In January 2017, Employee was "punched in

1

the head multiple times" when she attempted to break up an altercation between two residents. She notified her supervisor and was sent to a local hospital for medical attention where she was diagnosed with "concussion and post-concussion syndrome." She was taken out of work for two days, after which she said her symptoms subsided and she returned to work.[1]

On February 5, 2017, an altercation occurred in the facility when some residents who had gathered in the gym to watch the Super Bowl began assaulting other residents and staff members. In an expedited hearing, Employee testified that, in an attempt to restrain one of the female residents, she was "kicked in the forehead." She stated she had no immediate memory of getting kicked, but that her supervisor saw it happen. She testified that, after order was restored, she returned to her unit with her group of residents, which included the individual who had kicked her. Further, she testified that as she "was looking down [at documents] and just ensuring that all of the residents were there in their rooms, this same female patient that had kicked [her] in the forehead" came out of her room and "tackled [her]." She stated the resident grabbed her hair and repeatedly punched her in the head while dragging her approximately ten feet across the floor. Employee immediately sought medical attention at Nashville General Hospital. A CT scan of Employee's head was normal, and she was discharged with a diagnosis of concussion. The report of Employee's emergency department visit did not note any specific neurological abnormalities.

Employee received follow-up care with Concentra Urgent Care. The report of her February 9, 2017 visit noted Employee had a head contusion and "[p]ost-concussion syndrome" and indicated Employee had not returned to work. On a subsequent visit, she was released to return to work with restrictions, and a neurology referral was recommended. Employee testified in the expedited hearing that, following her release, she went to work and spoke with Employer's HR director but "just was not able to function."

Employer provided a panel of physicians from which Employee selected Dr. Garrison Strickland, a neurologist, as her treating physician. At her initial visit on March 1, 2017, Dr. Strickland noted Employee's history of the workplace incidents and her preexisting history of sports-related concussions and depression. Dr. Strickland's impression, noted in the initial report, was that Employee "ha[d] headache, dizziness and cognitive complaints following mild closed head injury." He noted that Employee "had multiple prior head injuries by history." He recommended an MRI of the brain "to evaluate for lesions that may not have been seen on CT," and he requested an EEG "because of [Employee's] memory complaints to evaluate for encephalopathy." He also

---

[1] Although the January 2017 incident occurred in the course of Employee's work, the petition for benefits for which the trial court conducted an expedited hearing identified February 5, 2017 as the date of injury.

recommended vestibular rehabilitation "[f]or treatment of dizziness," Neurontin to treat Employee's headaches, and he assigned work restrictions.

Employee returned to Dr. Strickland on April 10, 2017 with complaints of worsening headaches and dizziness. She had discontinued the Neurontin because of drowsiness, but reported that it was helping. Dr. Strickland noted that her brain MRI and EEG were normal, stating that he explained to Employee that "testing so far has shown no evidence of brain injury." He prescribed another medication for Employee's headaches. He also requested neuropsychological testing because of her complaints of memory loss, and he referred her to neurotology for her complaints of dizziness. At the expedited hearing, Employee testified Dr. Strickland referred her to Jessy Barclay, Ph.D., a neuropsychologist, and to Dr. Mitchell Schwaber, an otolaryngologist who specialized in neurotology. Dr. Strickland continued Employee's restrictions and noted "her symptoms seem to be out of proportion to [the] severity of her injury." Additionally, he noted that "progressively worsening symptoms are not consistent with [the] mechanism of her injury." Dr. Strickland advised Employee to discuss her symptoms with her primary care provider "in order to be evaluated for any non-work-related condition that may also be present."

When Employee next saw Dr. Strickland on June 5, 2017, she reported "being symptom free at rest," but experiencing "onset of symptoms with work/activity." Dr. Strickland noted that Employee slurred her words, had headaches with nausea and dizziness, cried easily, and had cognitive difficulty. His impression, as recorded in the June 5 report, stated that Employee "is improved," and that "[w]e will await Neuropsych testing and Neurotology appointment," which had not been completed. Dr. Strickland continued Employee's restrictions until she could be seen by Dr. Schwaber, adding that he would "defer to [Dr. Schwaber] with respect to restrictions related to balance." Finally, the assessment stated that Employee "may continue to do vestibular rehab until seen by Neurotology."

Employee's last visit with Dr. Strickland occurred on August 10, 2017. At that visit, she reported there was "no change in her symptoms of headache, dizziness and cognitive complaints." Dr. Strickland noted Employee had been seen by Dr. Schwaber "who diagnosed migrainous vertigo and [right] ear inner dysfunction." He also noted that "[n]europsych testing by Dr. Barclay showed no evidence of brain injury but did show problems with postconcussion syndrome for which Dr. Barclay recommended psychotherapy, psychiatric care and consideration of additional therapy at Pi Beta Phi or Tennessee Rehabilitation Services." In Dr. Strickland's report, he stated that he "defer[s] to Dr. Schwaber with respect to restrictions related to balance difficulties and [inner] ear injury." Dr. Strickland referred Employee to "Dr. Jeff Anderson for [p]sychiatric care and to Julie Johnson for [p]sychotherapy per Neuropsych testing recommendations." He deferred to "these postconcussion experts with respect to [the] need for additional therapy at Pi Beta Phi or Tennessee Rehabilitative Services." He also deferred "to these experts

3

with respect to [maximum medical improvement] and [permanent partial impairment]," noting that Employee "will continue to see Dr. Schwaber for dizziness." Finally, he indicated Employee was to be "[o]ff work until seen by Psychiatry."

Dr. Strickland subsequently signed a Form C-30A Final Medical Report dated February 1, 2018, that indicated Employee's date of maximum medical improvement ("MMI") was August 10, 2017, the date of her final visit with Dr. Strickland. The report also stated that Employee had no permanent impairment. However, the report additionally stated that Dr. Strickland's answers were "with respect to [h]eadache only."

At the expedited hearing, Employee testified that Dr. Strickland took her out of work at the August 2017 visit, and that she began to receive weekly workers' compensation benefits at that point that continued until "sometime in February of 2018." She testified that as of February 2018, she still had not seen the psychiatrist to whom Dr. Strickland had referred her, but she had seen Dr. Schwaber and Dr. Barclay.

Employee saw Dr. Schwaber on one occasion for her complaints of dizziness in July 2017. Dr. Schwaber diagnosed Employee with a vestibular injury from the workplace assault. A medical questionnaire sent to Dr. Schwaber in 2018 inquired about Employee's symptoms and diagnoses. Asked whether the "physical complaints and diagnoses" that Employee alleged were caused by her February 5, 2017 workplace incident were present before the February 5, 2017 incident, Dr. Schwaber's signed responses, dated May 8, 2018, indicated they were present before the incident. He was asked whether, based upon his evaluation of Employee, her medical history, and his review of her prior treatment records, he could give a medical opinion that any of the physical conditions for which Employee treated with him were "primarily related to her alleged February [5], 2017 workplace incident." He checked "yes" on the questionnaire and wrote that "[s]he has a VEMP [vestibular evoked myogenic potential] on the right as is often seen [with] head injuries." However, he noted that attributing "specific causation to [the work] incident with any certainty is difficult." Asked to identify how any symptoms for which he treated Employee differed from symptoms that predated the work injury, he wrote that "perhaps the rocking sensation can be attributed to the injury of the saccule on the right," adding that "none of the other documents note this." In response to a question concerning whether Employee had a permanent impairment "as the result of physical conditions that can be primarily related (more than 50% caused by) her February 5, 2017 workplace incident," he wrote "1% vestibular." Asked to explain how he reached his opinion "in light of similar findings that predate her February 2017 workplace incident," he wrote that Employee "has a mild vestibular impairment," adding that "causation is the question." A signed Form C-30A Final Medical Report that accompanied the medical questionnaire expressed Dr. Schwaber's opinion that Employee was able to return to work with restrictions on July 24, 2017.

Employer did not authorize Dr. Strickland's referrals to the psychiatrist, Dr. Anderson, or to the psychotherapist, Julia Johnson, and it did not schedule any follow-up appointments for Employee with Dr. Strickland or Dr. Schwaber. On February 8, 2018, Employer ceased paying weekly disability benefits and denied further benefits, citing Employee's multiple prior concussions, including a significant concussion Employee sustained while playing soccer in college in 2010. Employer based its denial on the opinion of neurologist Dr. Steven Graham, whom Employer had asked to evaluate Employee.

In a January 2018 report, Dr. Graham noted Employee's "most persistent subjective complaint at this time [was] dizziness," which the report indicated did not correlate with the neurological exam performed that day, as the exam was normal. He noted that her "[p]revious documented history of depression and anxiety are very likely contributing to ongoing subjective complaints." Noting that improvement from mild head injury or concussion without loss of consciousness typically occurs within the first two or three months, he concluded "it therefore would be highly unlikely that ongoing subjective symptoms are secondary to the work-related head injury."

Dr. Graham gave equivocal testimony in his deposition. On direct examination, he was asked his opinion "as to whether [Employee's] symptoms and complaints were primarily related to – and that would be 50 percent or more caused by her February 5, 2017, workplace incident." He responded, "Yeah. The majority of the symptoms certainly occurred after that time." He was then asked, "[s]o to clarify, would it be your opinion that the symptoms she was suffering from could be primarily related to the workplace incident," to which he responded, "[y]es." However, he also provided testimony inconsistent with these responses:

Q: Okay. From your evaluation of [Employee] and review of her prior treatment records, is it your opinion that all of the physical complaints and diagnoses that she alleges to have been caused by her work incident were already present prior to the date of injury?

A: Many of those symptoms had certainly been documented before that time.

Q: Okay. . . . From both your evaluation of [Employee] and review of her prior treatment records, is it your opinion that all of her mental and cognitive complaints and diagnoses that she's currently alleging were already present prior to February 5th, 2017?

A: Yeah. Those complaints had certainly been documented prior to that time.

5

Q: Okay. Based on your evaluation of [Employee], her medical history, and your review of her prior treatment, can you state within a reasonable degree of medical certainty that any of the physical conditions that she is alleging are primarily related to her workplace incident?

A: Certainly at that point in time, the continuation was, at least I felt, was to be unlikely to be due to that.

Q: . . . Can you state, based upon your examination and evaluation of the records, that any mental or cognitive conditions are primarily related to the February [5], 2017, incident?

A: No. I certainly see no reason to see [sic] that those were continuing at that time.

Dr. Graham further testified that concussions, "particularly after [a] head injury, can persist for sometimes two or three months, sometimes longer" but that "a year later and having those complaints would be far out of the range of expected." However, on cross-examination, Dr. Graham acknowledged that "individuals with previous concussions are at higher risk of concussions in the future," and that "some patients take longer than two to three months to recover."

At her attorney's request, Employee was seen for a psychiatric evaluation by Dr. Greg Kyser. Dr. Kyser's report noted Employee's long-standing and preexisting history of cognitive disorder associated with multiple contusions and her preexisting difficulties with depression, anxiety, and substance abuse. The report stated that Employee's preexisting history of concussions "puts her at enhanced risk for further traumatic brain injury." Dr. Kyser concluded in his report that Employee's level of functioning deteriorated following the February 2017 workplace incident, "which is directly related to her work injury." The report stated that Employee had been referred to the "cognitive rehabilitation program at Pi Beta Phi," adding that "this has not been authorized." Because Employee had not been able to participate in this program, Dr. Kyser concluded Employee "is not yet at [MMI]."

Dr. Kyser testified in his deposition that Employee was functioning well and able to work before the work-related incidents occurred, stating that "a substantial portion" of Employee's current difficulties were related to her workplace injuries as opposed to her prior concussions. When asked what that meant about the cause of Employee's "current issues," he responded, "[w]ell, were it not for the second injury, she probably would still be more functional and maybe even able to work in that position." He agreed that but for the February 5, 2017 incident, Employee would not have her current difficulties, and he reiterated the opinion expressed in his report that Employee had not attained MMI.

However, he qualified that opinion in his deposition testimony, stating he did not think Employee was at MMI "from a psychiatric point of view."

Dr. Kyser was questioned repeatedly concerning Employee's preexisting post-concussive syndrome, loss of functionality resulting from prior brain injuries, and cognitive problems. He testified that "patients that have repeated concussions are more prone to have more concussions; more difficulties; more prolonged course, you know; and ultimately . . . down the road, maybe even, you know, more difficulties." When asked his opinion about Dr. Graham's report stating that typically, "a patient will have improvement from a head injury with no loss of consciousness within two to three months," Dr. Kyser testified that "[what] he's describing is kind of a typical case, and I think [Employee's is] anything but a typical case of someone with a mild head injury."

In the expedited hearing, Employee testified about her sports-related concussion in 2010, acknowledging that she suffered from the "classic concussion symptoms of dizziness, nausea, . . . fatigue, [and] fogginess." She testified that she continues to experience vertigo, nausea, and migraines, and that she remains off work because of her condition.

Following the expedited hearing, the trial court found Employee was likely to prevail at trial in proving causation of her injury and in proving her entitlement to ongoing medical benefits and temporary disability benefits. The trial court ordered Employer to provide Employee the medical treatment recommended by Dr. Strickland; to pay accrued temporary disability benefits; and to continue paying temporary disability benefits until she is released to return to work or placed at MMI. Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2018). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a

way that does not favor either the employee or the employer.  Tenn. Code Ann. § 50-6-116 (2018).

## Analysis

Employer raises four issues on appeal, two of which we combine and restate, generally, as: whether the trial court erred in concluding that the preponderance of the evidence supports the determination that Employee would likely prevail at trial in establishing the compensability of her claim.  In addition, Employer asserts it should not be required to provide additional medical care or additional temporary disability benefits, and that the order for additional medical benefits is one with which it cannot comply.

An injured worker has the burden of proof on every essential element of his or her claim.  *See* Tenn. Code Ann. § 50-6-239(c)(6); *see also Buchanan v. Carlex Glass Co.*, No. 2015-01-0012, 2015 TN Wrk. Comp. App. Bd. LEXIS 39, at *5 (Tenn. Workers' Comp. App. Bd. Sept. 29, 2015).  However, at an expedited hearing, an employee can meet this burden by presenting sufficient evidence from which the trial court can determine that the injured employee would likely prevail at a hearing on the merits. *McCord v. Advantage Human Resourcing*, No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *9 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015).  This burden of proof is a lesser evidentiary standard than that applicable at trial.  However, it "does not relieve an employee of the burden of producing evidence of an injury by accident that arose primarily out of and in the course and scope of employment, but allows some relief to be granted if that evidence does not rise to the level of a 'preponderance of the evidence.'"  *Buchanan*, 2015 TN Wrk. Comp. App. Bd. LEXIS 39, at *6.

"An employer takes an employee 'as is' and assumes the responsibility of the employee having a pre-existing condition aggravated by a work-related injury that might not affect an otherwise healthy person. An employer may be liable for disability resulting from injuries sustained by an employee arising out of and in the course of his employment even though it aggravates a previous condition with resulting disability far greater than otherwise would have been the case."  *Mace v. Express Serv.*, No. 2015-06-0059, 2015 TN Wrk. Comp. App. Bd. LEXIS 19, at *9-10 (Tenn. Workers' Comp. App. Bd. June 19, 2015) (citations and internal quotation marks omitted).  Benefits may be ordered at an expedited hearing if the employee comes forward with sufficient evidence indicating a likelihood of proving at trial that the aggravation arose primarily out of and in the course and scope of employment.  *See* Tenn. Code Ann. § 50-6-102(14)(A) (2018).

"In evaluating expert medical opinions, a trial judge may consider, among other things, the qualifications of the experts, the circumstances of their evaluation, the information available to them, and the evaluation of the importance of that information by other experts."  *Venable v. Superior Essex, Inc.*, No. 2015-05-0582, 2016 TN Wrk. Comp. App. Bd. LEXIS 56, at *6 (Tenn. Workers' Comp. App. Bd. Nov. 2, 2016).  It is

generally within the discretion of the trial judge to determine which medical expert's opinion to accept. *Sanker v Nacarato Trucks, Inc.*, No. 2016-06-0101, 2016 TN Wrk Comp. App. Bd. LEXIS 27, at *11-12 (Tenn. Workers' Comp. App. Bd. July 6, 2016). We review a trial court's determination of which medical expert's opinion to accept for abuse of discretion, which will only be found if the judge "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Hubbard v. Sherman-Dixie Concrete, Indus.*, No. E2010-02219-WC-R3-WC, 2011 Tenn. LEXIS 965, at *11 (Tenn. Workers' Comp. Panel Oct. 18, 2011) (internal quotation marks omitted).

Here, the trial court considered the expert medical proof and concluded Dr. Kyser's opinion was more convincing than Dr. Graham's. The trial court noted that Dr. Kyser examined Employee more extensively than Dr. Graham and that he practices psychiatry, a field that the authorized physician, Dr. Strickland, deferred to for determining both Employee's date of MMI and whether she retained any permanent impairment. The trial court also noted that both experts acknowledged that Employee's prior concussions made her more susceptible to suffering a subsequent brain injury and a prolonged recovery.

Employee's authorized physician, Dr. Strickland, provided a written opinion addressing Employee's date of MMI and her permanent impairment. However, he qualified his opinion by indicating it was "with respect to headache[s] only," while stating in his report that he would defer to the professionals to whom he referred Employee to determine when she attained MMI. Moreover, Dr. Kyser agreed with Dr. Strickland's referral of Employee to specialists and to a specific program identified as Pi Beta Phi, stating he thought the referral to the program was "an appropriate form of treatment for the injury that [Employee] had."

Employer chose not to authorize treatment with the specialists to whom Dr. Strickland referred Employee and not to offer a panel of specialists in response to the referrals. Although Dr. Strickland stated in the report of Employee's final visit that Employee "will continue to see Dr. Schwaber for dizziness," Employer did not arrange any follow up visit with either Dr. Schwaber or Dr. Strickland. Instead, Employer sent Employee to Dr. Graham for an evaluation and relies on Dr. Graham's opinion in asserting that Employee's symptoms or complaints are not related to the February 5, 2017 incident. However, Dr. Graham's deposition testimony was equivocal at best. He and counsel for Employer had the following exchange:

Q: Okay. As a result, did you have an opinion as to whether [Employee's] symptoms and complaints were primarily related to – and that would be 50 percent or more caused by her February 5, 2017, workplace incident?

A: Yeah. The majority of the symptoms certainly occurred after that time.

9

Q: Okay. So to clarify, would it be your opinion that the symptoms she was suffering from could be primarily related to the workplace incident?

A: Yes.

Yet, almost immediately following this exchange, Dr. Graham testified that the physical conditions Employee alleged were "unlikely to be due to [the workplace incident]," and that he could "see no reason" that the mental and cognitive conditions of which Employee complained were continuing at the time of his examination. Dr. Graham's inconsistent testimony regarding causation resulted in the trial court concluding that Dr. Kyser's opinion was "more convincing than Dr. Graham's."

Dr. Kyser, on the other hand, testified in a manner consistent with Dr. Strickland's reports and recommendations, and he concluded that Employee had not reached MMI and required further treatment. As such, we conclude that it was not an abuse of discretion for the trial court to accept the opinion of Dr. Kyser over that of Dr. Graham. Accordingly, irrespective of whether the proof at this stage of the litigation is sufficient for Employee to prevail at trial, we conclude the preponderance of the evidence supports the trial court's interlocutory determination that Employee is likely to prevail in establishing the compensability of her claim at trial. Likewise, based upon Dr. Strickland's referral of Employee to specialists for additional treatment and his taking Employee out of work until she is seen by such specialists, we conclude the evidence supports the trial court's determination that Employee is entitled to the medical benefits and temporary disability benefits ordered by the trial court.

Relying on Tennessee Code Annotated section 50-6-207(1)(E) (2018), Employer argues that, because the treating physician ended "all active medical treatment," Employee is conclusively presumed to be at MMI and, therefore, is ineligible for additional temporary disability benefits. However, because Employer did not authorize the referrals made by the treating physician, Dr. Strickland, and did not authorize follow up visits with either Dr. Strickland or Dr. Schwaber, it is unclear what, if any, additional need for medical treatment remains. Dr. Strickland expressed the opinion that Employee is at MMI for her headaches, but he deferred to the experts to whom he referred Employee to determine the date of MMI. Although equivocating as to causation, Dr. Schwaber agreed Employee's physical condition that he treated was "primarily related to her alleged February [5], 2017 workplace incident." Importantly, neither treating physician was asked for or offered an opinion addressing whether all active medical treatment of Employee had ended. Based on Employer's refusal to provide additional treatment, the trial court determined it "cannot conclude that all active medical treatment ended, or that [Employee] reached MMI." We conclude the preponderance of the evidence supports these determinations.

10

Finally, Employer asserts it cannot comply with the trial court's order "as all treatment ordered had either already been completed or cannot be primarily related to Employee's alleged workplace injury." We find no merit in this assertion. Employee's authorized physician, Dr. Strickland, made referrals to specialists, which Employer failed to authorize. Any treatment recommended by an authorized provider selected from a panel in accordance with section 50-6-204(a)(3) is presumed to be reasonable and necessary and related to the work injury. *See* Tenn. Code Ann. § 50-6-204(a)(3)(H). It is Employer's burden to overcome this presumption, and we agree with the trial court that Employer did not do so.

Before concluding, we note Employer's argument that the trial court erred "by failing to grant Employer's motion for leave to file a Post-Hearing Brief to discuss previously-undisclosed medical records." The trial court conducted the expedited hearing on October 30, 2018. On November 5, 2018, Employer filed a motion requesting leave to file a post-hearing brief and a notice of filing medical records. Both filings were in response to its receipt of medical records after the expedited hearing concluded.

In the trial court's December 11, 2018 amended expedited hearing order,[2] the court noted that Employer filed a motion to admit into evidence additional medical records, and the court denied Employer's motion.[3] Although Employee filed a response requesting that the trial court deny Employer's motion, there is no indication in the record or in the amended expedited hearing order that the trial court ruled on Employer's motion to file a post-hearing brief. We conclude, under these circumstances, that the trial court's failure to rule on the motion was harmless.

## Conclusion

We hold that the evidence does not preponderate against the trial court's decision. Accordingly, the trial court's decision is affirmed and the case is remanded.

---

[2] The trial court entered an expedited hearing order on December 10, 2018, and entered an amended order the following day to correct typographical errors that "did not affect the Court's ruling."

[3] Although titled "Employer's Notice of Filing Medical Records from Pi Beta Phi," Employer's motion requested the court admit the records into evidence.

11



**TENNESSEE BUREAU OF WORKERS' COMPENSATION**
**WORKERS' COMPENSATION APPEALS BOARD**

| | |
|---|---|
| Kelly Gautreaux ) | Docket No. 2018-06-0366 |
| ) | |
| v. ) | State File No. 11346-2017 |
| ) | |
| Hermitage Hall, et al. ) | |
| ) | |
| ) | |
| Appeal from the Court of Workers' ) | |
| Compensation Claims ) | |
| Joshua D. Baker, Judge ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 12th day of March, 2019.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Sent to: |
|---|---|---|---|---|---|---|
| Zachary Wiley | | | | | X | zwiley@forthepeople.com rforrest@forthepeople.com |
| Chris Brooks | | | | | X | crbrooks@mijs.com |
| Gregory H. Fuller | | | | | X | ghfuller@mijs.com |
| Joshua D. Baker, Judge | | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | | X | penny.patterson-shrum@tn.gov |

Jeanette Baird
Deputy Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-0064
Electronic Mail: WCAppeals.Clerk@tn.gov